IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00828-MEH

RONNICA SIMONE BELL,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Ronnica Bell appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **reverses and remands** the ALJ's decision and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Cynthia McKinzie protectively filed an application for benefits on behalf of her daughter ("Plaintiff"), who was age 16 at the time of application. [AR 52-60]  Plaintiff, the age of majority

at all times relevant to her appeal [*see* AR 2], now seeks judicial review of the Commissioner's decision denying the application for DIB benefits, which was filed on May 30, 2012, alleging a learning disability, with an onset date of September 1, 2005. [AR 116, 139] After the application was initially denied on November 1, 2012 [AR 52-60], an Administrative Law Judge ("ALJ") held a hearing on October 21, 2013, upon the Plaintiff's request [AR 35-51]. On October 30, 2013, the ALJ issued a written, unfavorable decision, finding Plaintiff had not been disabled from the alleged date of the onset of disability through the date the application was filed. [AR 16-34] On February 19, 2015, the SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 3-5] *See* 20 C.F.R. § 404.981. Plaintiff timely filed her Complaint with this Court seeking review of the Commissioner's final decision. [Docket #1]

## II.     Plaintiff's Alleged Condition

Plaintiff was born on March 26, 1996, and was in elementary school on the alleged onset date, claiming a learning disability. [AR 22] Intelligence testing from 2008 indicated Plaintiff was functioning in the average range of intelligence. [AR 199-200] Plaintiff's educational records show she had an Individualized Education Program ("IEP") meeting at her school, Hinkley High School, on February 8, 2012, when she was 16 years old and in tenth grade. [AR 145] Plaintiff was then enrolled in a combination of general and special education classes. [AR 145-57, 165-85, 219-30] She struggled particularly in the area of math but was on track to graduate in May 2014 and wanted to become a nurse. [AR 148-50]

In a teacher questionnaire dated September 19, 2012, the Hinkley High School "staffing

chair," Diane King, concluded Plaintiff was functioning at a level consistent with same-aged, unimpaired students in regular education in many ways, but that she had a slight to obvious degree of limitation in the domain of acquiring and using information. [AR 201-08] Plaintiff's IEP was evaluated again on January 31, 2013. [AR 219] She was left in the same educational placement, with a combination of general and special education problems, the latter of which to help her with math and with some reading and writing issues. [AR 221] The evaluators noted that Plaintiff's learning disability affected:

> her performance in the general education curriculum and her ability to access new concepts without specialized instruction.  Her ability to perform at a level and rate of her non-disabled peers is inhibited.  Her academic deficits may impact her ability to train in a competitive setting without accommodation.

[AR 222]

## III.    Opinion Evidence

On October 18, 2012, at the request of the SSA, Plaintiff underwent a consultative evaluation with Meredith Campbell, Psy.D. [AR 236] Dr. Campbell's report indicates Plaintiff told her that the main problem keeping her from succeeding is "difficulties with understanding and solving math problems." [AR 236] In eleventh grade at the time of the evaluation, Plaintiff noted she was taking special education classes in math and reading, but her favorite class was English, and she again said she wanted to become a nurse. [AR 237] On Dr. Campbell's testing, Plaintiff obtained a full-scale IQ score of 59; however, the doctor stated that the full-scale IQ score was not indicative of Plaintiff's general intellectual functioning and, instead, found more reliable her score of 65 on the general ability index. [AR 239-40] Specifically, Dr. Campbell noted:

> The claimant is falling in the borderline range of functioning for her Verbal Comprehension and Working Memory scores and the mild to moderate mentally retardation range for all other scores.  Given that there is a 26 point difference between [her] four index scores, the Full-Scale IQ cannot be interpreted as a unitary ability.  Instead, the general ability index should be used as a better indicator of her overall intellectual functioning.  This claimant's general ability index is 65 [].

[AR 239] Subtests indicated Plaintiff has a learning disability, in agreement with her previous diagnosis. [*Id.*] Dr. Campbell concluded Plaintiff would have "mild to moderate limitations being able to understand, remember, and carry out short simple instructions, and moderate to marked limitations" being able to deal with more complex instructions, which Plaintiff would handle better if given to her verbally. [AR 240] The doctor also noted Plaintiff "does appear to have good organized habits and knows when to ask for help," although Plaintiff also "exhibits frustration and mild depression" when she "notices her deficits." [AR 240]

## IV.    Hearing Testimony

The ALJ held a hearing on October 21, 2013, at which her attorney had the opportunity to question her.  [AR 35-51] The attorney acknowledged that the entirety of Plaintiff's claim is based on her educational records. [AR 38-39] Plaintiff testified she attends Hinkley High School and takes classes at Pickens Technical College in the field of nursing. [AR 40-41] She testified she is good at English but struggles with math and has "a low-C average." [AR 41-43] The ALJ asked a variety of questions about Plaintiff's academic and social engagement at school. [AR 37-47] Plaintiff testified that she gets along well with students other students, has friends, has not gotten in trouble, handles transportation (walking or taking the bus) to and from school, helps with chores, and dresses and cares for herself. [AR 42-46]

In response to her attorney's questions, Plaintiff said she is shy and "stays to [herself] a lot," although she goes to the movies every other weekend with friends. [AR47-48] She noted she sometimes needs extra help from her teachers on assignments, saying "I may need the teacher to go over it with me a couple of more times." [AR 48] The attorney asked her about English class, where Plaintiff said she reads alongside a teacher: "[T]he teacher may read it to me, or ask me to like, read a paragraph, and yeah.  He just reads along with me." [AR 49] The teacher then would ask Plaintiff questions about what she just read. [*Id.*] Plaintiff said she usually is able to answer those questions, but "most of the time" has to "go back in the text to find the answer." [*Id.*] Plaintiff also testified she has trouble understanding vocabulary. [AR 49]  The ALJ followed up with a few final questions, asking Plaintiff what she likes to do at home, to which the Plaintiff replied: "I may get on the computer, do research or, you know, I may finish up my homework."  She said she has a laptop and texts people. [AR 50] No experts testified at the hearing. [AR 35-51]

The ALJ issued an unfavorable decision on November 14, 2013.  [AR 29-45]

## <u>LEGAL STANDARDS</u>

### I.     SSA's Three-Step Process for Determining Disability of a Child

SSA defines disability for persons under the age of 18 as "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).  Excluded from coverage is "any individual under the age of 18 who engages in substantial gainful activity."  42 U.S.C. § 1382c(a)(3)(C)(ii).  Social Security Regulations provide a three-step, sequential process

to evaluate a claim for Child's SSI Benefits pursuant to Title XVI of the SSA.  *See* 20 C.F.R. § 416.924.  First, the ALJ considers whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  Second, the ALJ considers whether the child has a medically determinable impairment that is severe, defined as an impairment that causes "more than minimal functional limitations."  *Id*. § 416.924(c).  Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment medically or functionally equals a disability listed in the regulatory Listing of Impairments.  *Id*. § 416.924(c)-(d).

A child's impairment "causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the Listings of Impairments. *Id*. at § 416.924(d).  A child's impairment functionally equals an impairment if it is "of listing-level severity . . . i.e. it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain."  *Id*. § 416.926a(b)(1).  If an impairment is found to qualify as medically or functionally equivalent to a listed disability, and if the 12-month durational requirement is satisfied, the child will be deemed disabled.  20 C.F.R. § 416.924(d)(1); *see also Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1237-38 (10th Cir. 2001).

Analysis of functionality considers how a child functions in six area, called "domains," and described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).  Those domains are as follows:

(i) acquiring and using information;
(ii) attending and completing tasks;
(iii) interacting and relating with others;
(iv) moving about and manipulating objects;
(v) caring for oneself; and

6

(vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  An ALJ makes a finding of disability if the limitation is "marked," defined as when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(I).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

7

## ALJ's RULING

At Step One of the three-step sequential evaluation for children, the ALJ first found Plaintiff had not engaged in substantial gainful activity at any time relevant to the ALJ's decision. [AR 22] At Step Two, the ALJ determined Plaintiff has one severe impairment: a learning disability. [*Id.*] At Step Three, the ALJ concluded: "Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.924, 416.925 and 416.926)." [AR 22] The ALJ then analyzed whether Plaintiff has an impairment or combination of impairments that functionally equals the Listings of Impairments, finding she does not. [*Id.*]

In arriving at this decision, the ALJ reviewed the six functional domains, noting that she "has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [*Id.*] She indicated that in considering Plaintiff's symptoms, she followed the required two-step process: (1) determining whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques and reasonably expect to produce Plaintiff's symptoms; and (2) evaluating the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limit the ability to do basic work activities.  [*Id.*] When symptoms are not supported by objective medical evidence, the ALJ wrote that she must make a finding on the credibility of the statements based on a review of the entire case record. [AR 23]

The ALJ noted she gave probative weight to the testimony of Plaintiff's mother and the information provided on the initial DIB application, completed by the mother, as both were

8

"generally consistent with the evidence of record." [*Id.*] However, the mother's testimony was not considered an acceptable medical source as, pursuant to the SSR, she was not medically trained and did not see Plaintiff in any professional capacity. [*Id.* (citing 20 C.F.R. § 404.1513(d), 20 C.F.R. § 404.913(d), and SSR 06-3p)] The ALJ took note of the mother's opinions as follows:

> The claimant's mother, Cynthia Mackenzie, stated the claimant's daily activities were not limited; her ability to communicate was limited (she could not repeat stories, tell jokes accurately, or use sentences with "because," "what if," or "should have been"); her ability to read, comprehend, tell time and do math was limited; her physical abilities were limited (she could not swim, drive a car, ride a bike, play sports or work video game controls); her social activities were not limited; she could not prepare a meal, take needed medication, use public transportation, accept criticism, or ask for help; and her ability to pay attention was limited (she did not complete homework or chores, could not keep busy on her own, and did not finish what she started).

[AR 23] The ALJ then reviewed Plaintiff's testimony at the hearing, summarizing as follows:

> [T]he claimant testified she wants to be a nurse and is on schedule to graduate from high school this year. She said she is in special education classes. She reported she does well in English, but math is hard for her. The claimant testified she has friends at school and has not been in trouble for misbehavior. The claimant said she is able to use public transportation and does not have any issues with personal care. She said she washes the dishes, vacuums, cleans her room, and helps her mother with chores. She reported she has trouble completing her homework on time and sometimes needs extra help with the same. The claimant stated she started in special education classes in 4th or 5th grade. She testified she always gets one-on-one help from her teacher at school and does not always understand the work the first time it is explained. She stated she has a laptop she uses at home and also is able to text.

[*Id.*] The ALJ then concluded that after having considered the evidence of record, she found Plaintiff's learning disability could reasonably be expected to produce the alleged symptoms; however, she did not find the statements regarding the intensity, persistence, and limited effects of those symptoms to be credible based on a review of the record. [*Id.*]

Next, the ALJ reviewed the record, starting with Plaintiff's IEP evaluation report from Aurora Public Schools, quoting special education teacher Diane King's summary in the report:

> "[Plaintiff] completed a variety of assessments, which accurately represent her skills, abilities, and personality traits. Her strong work ethic is evident in these assessments and in class.  She is able to complete her work and does it mostly on time.  She knows how to access support in class and continues to develop self-advocacy skills.  She is developing skills needed for independent living and her skills in this area are on par with her peers . . . She displays many of the work habits and academic skills needed to be successful in her fields of interest [hair stylist or nurse][.]"

[AR 23-24] The ALJ gave this and one other IEP report probative weight "as they are generally consistent with the evidence of record." [AR 25] However, the ALJ gave little weight to a statement on one IEP that indicated Plaintiff's "academic deficits may impact her ability to train in a competitive setting without accommodations," as the ALJ found that portion of the IEP did not definitely identify any specific limitations regarding the six domains of functioning. [*Id*.]

The ALJ gave great weight to two reports King completed in September 2012 regarding Plaintiff's abilities. [AR 24] The first, a Speech and Language Questionnaire, said there were no concerns regarding Plaintiff's language abilities, indicating Plaintiff could follow single and multi-step instructions. [*Id*.] The second, a Teacher Questionnaire, said Plaintiff had a seventh-grade reading level, a fifth-grade math level, and a sixth-grade written language level. [*Id*.] In the latter document, the ALJ wrote of King's opinion that Plaintiff had slight to obvious problems with acquiring and using information, but she had no problems in any of the other of the domains of functionality. [*Id*. (discussing the domains described above and used in 20 C.F.R. § 416.926a(b)(1)]

The ALJ also gave great weight to the only medical evidence in Plaintiff's record, that of Dr. Campbell, whose analysis the ALJ summarized as follows:

The claimant reported [to Dr. Campbell] the main problem keeping her from succeeding was understanding and solving math problems.  Dr. Campbell noted the claimant was not taking any prescription medications.  The claimant stated she washed dishes, took the trash out, did laundry and vacuumed.  She reported she like[d] to watch television, read and watch movies; the claimant said she occasionally spent times with friends.  The claimant reported she felt depressed when she did not know how to "do things at school."  She stated she had problems with concentration and occasional problems with memory.  The claimant's mental status examination was unremarkable.  Dr. Campbell opined the testing administered indicated the claimant had a learning disability and her general ability index placed her in the extremely low level of intellectual functioning.  She opined[,] "I do believe this is going to pose mild to moderate limitation on her ability to understand, remember and carry out short[,] simple instructions and moderat[e] to marked limitations [regarding] more complex instructions.  She does appear to have good organized habits and know when to ask for help. . . . I do believe that the claimant would have no limitations being able to have appropriate interactions with the public, peers and teachers."

[AR 25] The ALJ noted that Dr. Campbell based her opinion on her own objective findings and

observations. [*Id*.]

The ALJ then analyzed each of the six domains of function, concluding as follows:

<u>The claimant has less than marked limitation in acquiring and using information</u>. The record indicates the claimant's academic skills in reading, writing and math were/are below grade level.  The claimant needs one-on-one help at school and is in special education classes.  However, the claimant's GPA through the third term of 11th grade was a 2.287 and she testified she had a low C average at the technical college classes she is taking.  The claimant is also able to use public transportation.

<u>The claimant has less than marked limitation in attending and completing tasks</u>. The claimant has trouble completing her homework on time, but does get it in.  She testified she washes the dishes, vacuums, cleans her room and helps her mother with chores.  An IEP report indicated it was difficult for the claimant to study or learn when there were people walking around or there was noise in her learning environment.

<u>The claimant has less than marked limitation in interacting and relating with others</u>. The January 2013 IEP report indicated the claimant was "very quiet" and often did not ask questions but waited "until a teacher approaches her first."  There is no

11

indication of any behavioral issues in the record[,] and the claimant stated she did have a couple friends she spent time with occasionally.

<u>The claimant has no limitation in moving about and manipulating objects</u>.  There is no indication in the medical evidence of record that the claimant has any limitations in this areas.

<u>The claimant has no limitation in the ability to care for herself</u>.   There is no indication in the medical evidence of record that the claimant has any limitations in this area.

<u>The claimant has no limitation in health and physical well-being</u>.   There is no indication in the medical evidence of record that the claimant has any limitations, other than age-appropriate limitations, in this area.

[AR 25-30 (general SSR language for each domain omitted)]

Thus, the ALJ concluded Plaintiff "has not been disabled since May 30, 2012, the date the application was filed."  [AR 31]  Plaintiff sought review of the ALJ's decision by the Appeals Council on November 2, 2013 [AR 15], which was denied on February 19, 2015 [AR 3-6].  Plaintiff filed her Complaint in this matter on April 20, 2015.  [Docket #1]

## ANALYSIS

On appeal, Plaintiff asserts the ALJ erred in (1) failing to find Plaintiff's mental impairment met or equaled the severity of the relevant listing; (2) not basing her opinions about the six domains on substantial evidence; and (3) not making findings of fact based on substantial evidence regarding Plaintiff's ability to acquire and use information.  Opening Brief, docket #20 at 2.

### I.      Severity of Mental Impairment and the § 112.05 Listing

Plaintiff argues her full-scale IQ scale of 59 on the Wechsler Adult Intelligence Scale test administered by Dr. Campbell conclusively shows Plaintiff is disabled.  *Id*. at 16-18.   She thus

asserts the ALJ was obligated to find Plaintiff's mental impairment met the listing of 20 C.F.R. 404, Subpt. P, App. 1, § 112.05 ("Listing 112.05"). *Id*. at 17.  Furthermore, Plaintiff points out that the ALJ made no findings specifically regarding §112.05C, nor did she explain her reasons for not applying it. *Id*. at 18.  Defendant counters that an IQ score standing alone is insufficient basis on which to award benefits, as Plaintiff had to first meet the diagnostic description of the listing to demonstrate *per se* disability.  Response, docket #21 at 6.  Defendant further argues that any error by the ALJ in not providing analysis regarding the IQ scores is harmless, as "the evidence in this case overwhelming establishes that [Plaintiff] did not meet or medically equal the requirements of Listing 112.05C."

SSA's Listings of Impairments contains sections specifically related to children and intellectual disabilities.  20 C.F.R. 404, Subpt. P, App. 1, §112.05.  The relevant section, Listing 112.05, reads as follows:

> 112.05 Intellectual Disability: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
>
> A. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02;
>
> OR
>
> B. Mental incapacity evidenced by dependence upon others for personal needs (grossly in excess of age-appropriate dependence) and inability to follow directions such that the use of standardized measures of intellectual functioning is precluded;

OR

C. A valid verbal, performance, or full scale IQ of 59 or less;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;

OR

E. A valid verbal, performance, or full scale IQ of 60 through 70 and:

1. For older infants and toddlers (age 1 to attainment of age 3), resulting in attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in either paragraphs B1a or B1c of 112.02; or

2. For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02;

OR

F. Select the appropriate age group:

1. For older infants and toddlers (age 1 to attainment of age 3), resulting in attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in paragraph B1b of 112.02, and a physical or other mental impairment imposing an additional and significant limitation of function;

OR

2. For children (age 3 to attainment of age 18), resulting in the satisfaction of 112.02B2a, and a physical or other mental impairment imposing an additional and significant limitation of function.

*Id*. A claimant must also meet the preamble definition regarding mental disorders generally. *Id*. §

112.00. There, the Regulations provide subsections A-F, defining the requisite severity of the

14

disability, which the Court reproduces at length (omitting portions specific to age groups not relevant to Plaintiff) to explain the unique handling of a case involving a child:

112.00 Mental Disorders

A. Introduction: The structure of the mental disorders listings for children under age 18 parallels the structure for the mental disorders listings for adults but is modified to reflect the presentation of mental disorders in children. The listings for mental disorders in children are arranged in 11 diagnostic categories: Organic mental disorders (112.02); schizophrenic, delusional (paranoid), schizoaffective, and other psychotic disorders (112.03); mood disorders (112.04); intellectual disability (112.05); anxiety disorders (112.06); somatoform, eating, and tic disorders (112.07); personality disorders (112.08); psychoactive substance dependence disorders (112.09); autistic disorder and other pervasive developmental disorders (112.10); attention deficit hyperactivity disorder (112.11); and developmental and emotional disorders of newborn and younger infants (112.12). []

The structure of the listings for Intellectual Disability (112.05) [] is different from that of the other mental disorders. Listing 112.05 (Intellectual Disability) contains six sets of criteria. If an impairment satisfies the diagnostic description in the introductory paragraph and any one of the six sets of criteria, we will find that the child's impairment meets the listing. For listings 112.05D and 112.05F, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it causes more than minimal functional limitations, i.e., is a "severe" impairment(s), as defined in § 416.924(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in § 416.924(c), we will not find that the additional impairment(s) imposes an additional and significant limitation of function. []

B. Need for Medical Evidence: The existence of a medically determinable impairment of the required duration must be established by medical evidence consisting of symptoms, signs, and laboratory findings (including psychological or developmental test findings). Symptoms are complaints presented by the child. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source. Symptoms and signs generally cluster together to constitute recognizable mental disorders described in paragraph A of the listings. These findings may be intermittent or continuous depending on the nature of the disorder.

C. Assessment of Severity: In childhood cases, as with adults, severity is measured according to the functional limitations imposed by the medically determinable mental impairment. However, the range of functions used to assess impairment severity for children varies at different stages of maturation. The functional areas that we consider are: Motor function; cognitive/communicative function; social function; personal function; and concentration, persistence, or pace. In most functional areas, there are two alternative methods of documenting the required level of severity: (1) Use of standardized tests alone, where appropriate test instruments are available, and (2) use of other medical findings. (See 112.00D for explanation of these documentation requirements.) The use of standardized tests is the preferred method of documentation if such tests are available. []

4. Adolescents (age 12 to attainment of age 18). Functional criteria parallel to those for primary school children (cognitive/communicative; social; personal; and concentration, persistence, or pace) are the measures of severity for this age group. Testing instruments appropriate to adolescents should be used where indicated. Comparable findings of disruption of social function must consider the capacity to form appropriate, stable, and lasting relationships. If information is available about cooperative working relationships in school or at part-time or full-time work, or about the ability to work as a member of a group, it should be considered when assessing the child's social functioning. Markedly impoverished social contact, isolation, withdrawal, and inappropriate or bizarre behavior under the stress of socializing with others also constitute comparable findings. (Note that self-injurious actions are evaluated in the personal area of functioning.)

a. Personal functioning in adolescents pertains to self-care. It is measured in the same terms as for younger children, the focus, however, being on the adolescen''s ability to take care of his or her own personal needs, health, and safety without assistance. Impaired ability in this area is manifested by failure to take care of these needs or by self-injurious actions. This function may be documented by a standardized test of adaptive behavior or by careful descriptions of the full range of self-care activities.

b. In adolescents, the intent of the functional criterion described in paragraph B2d is the same as in primary school children, However, other evidence of this functional impairment may also be available, such as from evidence of the child's performance in work or work-like settings.

D. Documentation: 1. The presence of a mental disorder in a child must be documented on the basis of reports from acceptable sources of medical evidence. See §§ 404.1513 and 416.913.  Descriptions of functional limitations may be available from these sources, either in the form of standardized test results or in other medical

findings supplied by the sources, or both. (Medical findings consist of symptoms, signs, and laboratory findings.) Whenever possible, a medical source's findings should reflect the medical source's consideration of information from parents or other concerned individuals who are aware of the child's activities of daily living, social functioning, and ability to adapt to different settings and expectations, as well as the medical source's findings and observations on examination, consistent with standard clinical practice. As necessary, information from nonmedical sources, such as parents, should also be used to supplement the record of the child's functioning to establish the consistency of the medical evidence and longitudinality of impairment severity. []

9. Identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in listing 112.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15, e.g., the Wechsler series. IQs obtained from standardized tests that deviate significantly from a mean of 100 and standard deviation of 15 require conversion to a percentile rank so that the actual degree of limitation reflected by the IQ scores can be determined. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05.

10. IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. []

E. Effect of Hospitalization or Residential Placement: As with adults, children with mental disorders may be placed in a variety of structured settings outside the home as part of their treatment.[]

F. Effects of Medication: Attention must be given to the effect of medication on the child's signs, symptoms, and ability to function.[]

*Id.*

Here, the ALJ found Plaintiff has a "severe" learning disability and concluded Plaintiff's impairment did not meet or medically equal the requirements of a listing impairment, noting she

considered Listings 112.02 and 112.05.[1] [AR 22] Plaintiff argues, however, that the ALJ was required to look to Plaintiff's results on the Wechsler IQ test that show a full-scale IQ of 59, which meets Listing 112.05C, because Plaintiff has a "valid verbal, performance, or full scale IQ of 59 or less." Opening Brief, docket #20 at 17.

Defendant concedes the ALJ did not specifically discuss Plaintiff's IQ score of 59 yet argues this is harmless error, because "the evidence in this case overwhelmingly establishes that [Plaintiff] did not meet or medically equal the requirements" in the Listings. Response, docket #21 at 5-6. Defendant specifically asserts that the diagnostic description of Listing 112.00 requires evidence of intellectual disability characterized by "significant subaverage general intellectual functioning with deficits in adaptive functioning," with subsections A-F defining the requisite severity, and Listing 112.05C requiring a valid IQ score of 59 or less. *Id.* at 6. Because the ALJ explained that she was not persuaded by the evidence of record and found Plaintiff did not generally meet the Listings, Defendant essentially asserts the ALJ's opinion is thorough enough despite its lack of analysis regarding the IQ score. *Id.*

Defendant further correctly points out that there was a wide discrepancy in the results of Plaintiff's IQ test, administered by Dr. Campbell in 2012. Even Dr. Campbell indicated some distrust of the numbers, stating that the full-scale IQ score of 59 could not "be interpreted as a unitary ability," because there was a large difference between the sub-test scores. [AR 239] Dr.

---

[1]Listing 112.02 covers "Organic Mental Disorders: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain." 20 C.F.R. 404, Subpt. P, App. 1, §112.02. The ALJ did not elaborate on her use of this section, mentioning only in a boilerplate section of the opinion, and Plaintiff's argument regarding the Listings focuses on Listing 112.05; thus, the Court will not further analyze the ALJ's reference to Listing 112.02.

Campbell thus concluded that Plaintiff's general ability index of 65 was a better indicator of her overall functioning that the lower full-scale score of 59. [*Id.*] Defendant concludes that "[t]hese comments by Dr. Campbell significantly undercut [Plaintiff's] claim that she must be found disabled because of a single test score." Response at 7.

The Court agrees with Defendant that while Dr. Campbell explained this discrepancy in scores in her report, the ALJ did not. The ALJ in fact did not mention the scores at all, noting only as follows:

> The claimant's medical status examination was unremarkable. Dr. Campbell opined the testing administered indicated the claimant had a learning disability and her general ability index placed her in the extremely low level of intellectual functioning. She opined, "I do believe this is going to pose mild to moderate limitation on her ability to understand, remember, and carry out short, simple instructions and moderate to marked limitations on [] more complex instructions. She does appear to have good organized habits and know when to ask for help . . . I do believe that the clamant would have no limitations being able to have appropriate interactions with the public, peers, and teachers." The undersigned gives great weight to Dr. Campbell's opinion as it is consistent with the evidence of record. Dr. Campbell is an examining and acceptable medical source pursuant to the Regulations. Dr. Campbell based her opinion on her own objective findings and observations. Again, the undersigned does give the claimant the benefit of the doubt and finds she has less than marked limitations interacting and relating with others.

[AR 25] While the ALJ's opinion may have intended to incorporate Dr. Campbell's analysis of the discrepancy between Plaintiff's scores, the ALJ's failure to specifically address the scores and their relation to the Regulations is error. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (even though an ALJ is not required to discuss every piece of evidence, it must be clear that the ALJ considered all of the evidence). "[I]n addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as

significantly probable evidence [she] rejects." *Id.* at 1010.   Importantly, Listing 112.00D9

specifically provides that "[i]n cases where more than one IQ is customarily derived from the test

administered, e.g., where verbal, performance, and full-scale IQs are provided in the Wechsler

series, the lowest of these is used in conjunction with Listing 112.05." 20 C.F.R. 404, Subpt. P,

App. 1, §112.00.  Thus, the lowest IQ score – clearly significantly probative evidence – needed to

be discussed in this case.

Further, while the ALJ here did in passing mention Listing 112.02 and 112.05, the language

appeared only in a boilerplate section of the opinion, not tied to anything specific to the analysis of

this case. [AR 22]  Boilerplate language, unconnected to any evidence in the record, will not suffice

to support an ALJ's conclusion.  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The ALJ

failed to discuss the Listings  and the important interplay between Listing 112.05C and 112.00's A-F

language, which is error as that analysis goes to the heart of this case.

Having found the ALJ erred, the Court, according to Plaintiff, should simply award benefits

based on Listing 112.05C's IQ score of 59, which Plaintiff meets.  However, the Court agrees with

Defendant that Listing 112.05 does not provide a *per se* award of benefits to a claimant without that

claimant also meeting one of the severity prongs. *See Montano v. Astrue*, No. 11-cv-02303-WJM,

2012 WL 6701804, at *2 (D. Colo. Dec. 26, 2012); *see also King v. Astrue*, No. 10-cv-01530-LTB,

2011 WL 3471015, at *4 (D. Colo. Aug. 8, 2011) (to meet listing requirements, the plaintiff "had

to show that her impairment met or equaled the capsule definition of mental retardation; that he had

a valid IQ score of 70 or below; and that he had another severe impairment.").

Thus, the Court must remand the case for further analysis by the ALJ, which must include

specific discussion of the IQ scores and their discrepancy, as well as an analysis of the severity prongs.

## II.    Other Issues

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 2014 WL 969688, at *2 n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining arguments and neither party should take the Court's silence as implied approval or disapproval of the arguments. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the [ALJ's] treatment of the case on remand."). The Court also does not suggest a result that should be reached on remand; rather, the Court encourages parties and the ALJ to consider fully and anew the evidence and all issues raised. *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citations and quotation marks omitted).

## CONCLUSION

In sum, the Court concludes the ALJ in this case erred by failing to analyze probative record evidence of Plaintiff's IQ scores and by not explaining her reasoning for rejecting the score related to Listing 112.05C. The Court thus finds the final decision is not supported by substantial evidence in the record as a whole. Therefore, the ALJ decision that Plaintiff Ronnica Bell was not disabled is **reversed and remanded** for further review and explanation.

Dated at Denver, Colorado this 24th day of March, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge